Bentley, J.
This case, as before announced, was submitted last summer to the court, consisting of two judges. Owing to the illness of one of the judges, a conclusion was not reached in time for decision last term, and we have lately arrived at a conclusion regarding the principal points arising in the case, it having been brought by appeal from the judgment of the court of common pleas.
The plaintiff, in his petition below- alleged, in substance, that he was a creditor of William S. Russell in a certain amount, and that, in March, 1882, William S. Russell was in an insolvent condition, and that in view of his insolvency — in contemplation of his insolvency — he executed and delivered to the defendant, Rowland F. Russell, a chattel mortgage upon certain property named in the mortgage and described in the petition, and he alleges that that mortgage was given to Rowland F. Russell, in trust, to prefer certain creditors, and that it was also given to hinder, delay and defraud certain creditors of William S. Russell.
In that action notice was published under sec. 6344, Rev. Stat., and certain other creditors of William S. Russell came into the case, as provided in that section, filed their answers and cross-petitions, and set up the claims of the creditors respectively against William S. Russell and joining in the prayer of the petition, and they seek to share in whatever may be the results of this transaction.
After the original pleadings were filed in the case, on February 9, 1885, the plaintiffs filed a supplemental petition, in which they^ allege that they have reduced their claims to judgment against William S. Russell and have caused execution to be issued and levies made upon certain of the property described in the petition which had formrly been covered by a certain mortgage to the defendant, Jennie B. Stocking, for $1,0.00, and which mortgage to Jennie B. Stocking, they claim had lapsed, or become invalid for want of proper refiling or renewal, and they claim that they have by those levies, a special lien upon the chattels which were thus levied upon as against all parties.
Subsequent to that, also, an amended and supplemental petition was filed by the plaintiffs in the case, alleging that a large amount of this property sought to be subjected to the payment of plaintiff’s claim had been in the possession of the defendant, Rowland F. Russell, since about April 1, 1882, and calling upon him to- account a trustee, for the use of the property thus used by him for his own benefit a portion of the time *834 since, and had been rented by him during certain other portions of time since 1882, and calling upon him to account as trustee for the use of the property thus used by him and rented out by him.
Rowland F. Russell answers in the case, admitting the making of the instrument — the chattel mortgage which is attached in the proceeding, and denying- all fraud or intention to hinder or delay creditors, denying that the mortgage was given in trust to p refer any creditors and saying that it was given to secure himself for claims that he had against William S. Russell and to indemnify him for certain indorsements that he had made in behalf of William S. Russell, and also to secure himself against any future indorsements that he might make after the making of the taortgage.
The question then presented to us by the pleadings, the proofs and the testimony, is: Whether this chattel mortgage which was given to
Rowland F. Russell is such an instrument as is referred to in sec. 6343, Rev. Stat.; or whether it was given under such circumstances as are beferred to in sec. 6344, Rev. Stat.
In order that we may have before our minds the provisions of these Sections, we read sec. 6343, Rev. Stat, which provides:
"All assignments in trust to a trustee or trustees, made in contemplation of insolvency, with the intent to prefer one or more creditors, shall inure to the equal benefit of all creditors, in proportion to the amount of their respective claims, and the trusts arising under the same shall be administered in conformity with the provisions of this chapter.”
Section 6344, Rev. Stat., provides as follows:
"All transfers, conveyances, or assignments made by a debtor or procured by him to be made with intent to hinder, delay, or defraud creditors, shall be declared void at the suit of any creditor; and the probate judge of the proper county, after any .such transfer, conveyance or assignment shall have been declared, by a court of competent jurisdiction, to have been made, with the intent aforesaid, or in trust with the intent hientioncd in the next preceding- section, shall on the application of any creditor, appoint a trustee according to the provisions of this chapter Who, upon being duly qualified, shall proceed by due course of law, to tecover possession of all property so transferred, conveyed, or assigned, and to administer the same as in other cases of assignments to trustees for the benefit of creditors; provided, however, that any creditor instituting a suit for the purpose aforesaid, shall cause notice of the pendency and object thereof to be published for at least four consecutive weeks in some newspaper printed or of general circulation in the county in which said suit shall be pending; and all creditors who shall, within fifteen days next after the expiration of said notice, file an answer in said action in the nature of a cross-petition, praying to be made parties thereto, and setting forth the nature and amount of their respective claims, and shall secure the payment of their pro rata share of the cost and expenses of such action, including reasonable counsel fees, in proportion to the amount of their claims, shall be first entitled, wtih the plaintiff, to the benefits of such transfer, conveyance, or assignment, in proportion to the amounts of their respective claims.” * * * *
_ It will be noticed that sec. 6343, Rev. Slat., provides for a case in which an asigmnent is made to a trustee or trustees, by the insolvent debtor, and that in such case the assignment or instrument, instead of being declared void and set aside, simply inures to the equal benefit of all creditors in proportion to the amount of their respective claims; while sec. 6344 provides that transfers and conveyances made with the intent therein referred to, shall be declared void at the suit of any creditors, and then the property shall be administered as provided in that setion.
*835 The chattel mortgage given by William S. Russell to his father, Rowland F. Russell, is in the usual form as to the beginning of it, describing the property herein conveyed, being personal property, and this ■occurs in it:
. "Hereby covenanting, that the title hereby conveyed is clear, free, and unincumbered, and that I will warrant and defend the same against the lawful claims of all persons whomsoever, 'except a certain chattel mortgage to one Jennie B. Stocking. The condition of the above conveyance is such, that, whereas the said Rowland F. Russell has already incurred personal liability by reason of going- security for and by endorsement of certain commercial paper, for and to the benefit of said William S. Russell and may incur still further liability by reason of further endorsement or going security for said William S. Russell, and that whereas the said William S. Russell is now indebted to said Rowland F. Russell in the sum ol 82500 upon open account and for moneys loaned and advanced and may become still further indebted for future advances to said Rowland F. Russell. Now, if said William S. Russell shall protect and save Rowland F. Russell harmless and free from all said liabilities now or hereafter incurred by said Rowland F. Russell for the benefit of said William S. Russell, and shall well and truly pay said sums of money and future advances as the same shall fall due, then this conveyance to be void, otherwise in force”— with the usual provisions following, as to the possession of the mortgaged property. This mortgage bears date on the eighteenth of March, 1882; but the first verification of it is dated on March 24, 1882, and is as follows:
"State of Ohio, Lucas County, ss.: Rowland F. Russell, being first duly sworn, deposes and says that he is the mortgagee named and described in the annexed mortgage, and that said mortgage is executed and taken in good faith by him to secure and indemnify this mortgagee first against loss and liability by reason of his endorsing commercial paper and his becoming stay on execution for the use and benefit of said mortgagor and to secure the payment of certain indebtedness due from said mortgagor to this mortgagee, individually and as tiustee, and to- secure him against loss and liability on future advances and future endorsements and future stay of execution bonds to and for the benefit of said mortgagor, all of which are more particularly described as follows:
"1. To secure and indemnify against loss and liability on endorsements of paper and its renewals, with interest held by the Merchants’ National Bank of Toledo, Ohio, to the amount of four thousand dollars.
"2. To secure and indemnify against loss and liability on a certain note and its renewals with interest, held by Thomas & Co., of Columbus, Ohio, to the amount of two hundred and ninety-two dollars, or thereabouts, with interest. , -
"3. To secure and indentnify against loss and. liability on a certain stay of execution bond in favor of Chamberlain, Dyer & Fowler on Justice Scott’s docket, Port Lawrence township, Lucas county, Ohio, to the amount of about one hundred and ten dollars, with interest.
"4. To secure the payment of an existing indebtedness and this mortgagee from said mortgagor for moneys loaned, and an open account to the amount of five hundred and five dollars, or thereabouts, with interest.
“5. To secure the payment of the balance of account due Russell & Thayer from said mortgagor of about twenty-five hundred dollars, with interest.
“'0. To secure indemnity against loss and liability for and by reason of future advances, future endorsements of paper and liability on future stay of execution bonds, n-ot to exceed- together with the above liabilities *836 and indebtedness said sum of eight thousand dollars and interest thereon, being all for the use and benefit of said mortgagor, William S. Russell.
(Signed) ROWLAND F. RUSSELL.
"Subscribed and sworn to before me this March 24, 1882.”
It seems that this mortgage, being delivered about the date of its verification, March 24, 1882, on the first day of April Mr. Rowland F. Russell entered into an agreement with his son regarding quite a large amount of property, and perhaps substantially all of the property of William S. Russell which was not covered by that mortgage — that contract of April 1, 1882, referring to the mortgage and describing the property as being all the property around the iron works except such as was conveyed by that mortgage, and by that agreement Mr. Russell, in consideration of the assignment of this last mentioned properly, agreed to pay certain sums to certain creditors of William S. Russell concurrently with the taking possession of the property covered by his agreement. Mr. Russell took possession of all the property mentioned in the chattel mortgage as well, and has since either had it or lias rented it out — so far as it is in existence. No attack is made upon the second agreement, which provided for the payment of a certain percentage of the debts of sundry parties to this action, and they have received the percentage therein referred to, and do not attack this transaction except as it bears upon the condition of William S. Russell and the firm his father is concerned in, it is of perhaps no further importance in this case.
After Mr. Russell had taken possession of the property and had filed this chattel mortgage — somewhere about a year later — March 28, 1883, he appends to the original mortgage, and filed as of said date, this renewal.
“State of Ohio, Lucas County, ss.:
"Rowland F. Russell, being first duly sworn, says that he is the mortgagee named and described in the annexed chattel mortgage. That said mortgage was executed and taken, and is still held' in good faith by this affiant to secure and indemnify him against loss individually and as trustee, on existing indebtedness, on liabilities incurred, and on future advances and future signing or endorsement of paper, according to the tenor of said mortgage, entered into or to be entered into for the use and benefit of said William S. Russell, mortgagor.
"That the sum of eight thousand dollars named in said mortgage with the addition of eight per cent, interest thereon from March 18, 1882, remains the same as when given. That the purposes for which said mortgage was given have not yet ended, and that said mortgagor is still indebted_ to this mortgagee upon the matters herein set forth, and that the liabilities incurred by this affiant and provided for by said mortgage are still binding upon him, for the use and benefit of said mortgagor, that the same are just and unpaid, and more particularly set out in the manner and form as follows:
“1. That said William S. Russell is still indebted to this affiant as trustee for Russell & Thayer in the sum of twenty-five hundred dollars, or thereabouts, with interest from March 18, 1882. That the same is just, and wholly unpaid.
"2. That said William S. Russell is still indebted to this affiant in the sum of twenty-seven hundred and ninety-eight dollars and twenty-six cents, with interest at eight per cent., moneys which this affiant has been compelled to pay upon the liabilities provided against in said mortgage, and described in the former affidavit hereto annexed. That the same is just, and wholly unpaid.
"3. That said William S. Russell is indebted to this affiant in the fprther sum of twelve hundred and eighty dollars and ninety-two cents, *837 with interest at eight per cent., moneys advanced by this affiant to said. AVilliam S. Russell for his use and benefit, also provided for by the terms of said mortgage. That the same is just, and wholly unpaid.
“4. That this affiant is still liable upon said commercial paper held, by the said Merchants’ National Bank of Toledo (originally §4,000 with, interest), and its renewal in the sum of fifteen hundred dollars, with interest. That the same is just, and still unpaid.
‘'5. That the affiant also holds said mortgage to secure and indemnify him against loss and liability for and by reason of future advances, future signing or endorsement of paper to said AVilliam S. Russell for his-use and benefit, not to exceed together with the above indebtedness and! liabilities the said sum of eight thousand dollars, with interest as aforesaid.
“This affiant further says that said property mentioned and described in said mortgage of which this is made a part, is now in the use- and possession, of this affiant, and that the said mortgage t.till remains-in force.
“Subscribed and sworn to before me, this March 22, 1883.
(Signed) R. F. RUSSELL.”
It is claimed that before any action was taken by any of the creditors-after the making and filing of this mortgage, Rowland F. Russell having-taken possession of this property, 'that the affidavits appended to this mortgage — either the original or the renewal affidavit — are of no moment, as an affidavit is only required in.cases where there is continuous-possession, and that therefore the affidavits cannot be considered by the court for any purpose, and that they are not a part and parcel of the mortgage. AYhile we think that the rule is that the affidavit is only required, where there is no immediate and continuous possession, yet we think, we have a right to consider these affidavits and their provisions as bearing upon the facts of the case — as admissions, so far as they contain-admissions, of R. F. Russell regarding his .knowledge, regarding the real purpose of the parties in making the mortgage — and for those purposes, we have, to some extent at least, considered them.
Among other witnesses who testified in the case, was Rowland F. Russell, the defendant. In the course of his examination, he is asked this question by his counsel: *
“Q. Coming now to the time of the execution of your mortgage, I want you to state to the court how you came to take it — what was your object in. doing it, and how he came to execute it to you, and how much he owed you? (Answer.) That brings it down to about the first of March, 1882. About that time, Mr. Thayer asked me one day, if I knew that there was a mortgage of §1,000 on the property over there that AVilliam had given to Jennie Stocking. I told him I didn’t know anything about that. He said he had discovered it on the records over-at the court house; and, in connection with that fact becoming known to me, and in connection with these two suits that had been commenced" against him — and there was one of these parties to which he had given a note for iron that was becoming due about that time, had proposed to give him long-er time if I would endorse his paper, and giving it a hasty consideration, and looking the matter over, I thought the best way was for him to give me the mortgage and secure me for the indebtedness or prevent these other parties from making any trouble that would embarrass him — so that I could help him through, that is, by giving him time to take care of the matter.”
In the course of the cross-examination of R. F. Russell, in speaking of the taking of the mortgage, and the circumstances of his son at. the time, he was asked this question:
*838 "Q. You had no anticipation but what he could pay out? A. I supposed he would eventually pay out whatever he owed, the five thou- • sand dollars and all, although that was a matter away behind everything.
“Q. You said you thought you could tide him over and keep people off of him until he could straighten himself out? A. Yes, sir.”
And in the further examination it appears that Mr. Russell, the ■ father, was knowing at that time that the son was heavily indebted. He knew that he came here perhaps some eighteen months before and that he had a thousand dollars only. He bought a part of the iron works of Russell & Thayer for five thousand dollars, and none of that had been paid, but the old gentleman still held it as against his son, he having arranged to charge it over to himself, so far as Russell & Thayer were concerned, so that he claimed to hold the five thousand dollars against 'his son. And there were twenty-five hundred dollars of a running account run up by Wm. S. Russell with Russell & Thayer after Wlliiam S. Russell bought the plant which was then unpaid, and which the old gentleman claimed that he really owned, and the fact was that he had said to Mr. Russell that whatever his son should buy of the firm he would be responsible for, that it would be charged over to him, although it was not charged over at that time, it was afterwards charged over, as the old gentleman claims in accordance with the original agreement. 'We find that the old gentleman had knowledge at the time he took this mortgage, that various debts of the son were due, and that he could ■not pay them; arrangements were made with the bank from time to time; that one creditor, at least, had sued him, and that the old gentleman had stayed execution for $110; that the running expenses of the concern — coal bills, etc., were to some extent unpaid, and that in fact, the son was insolvent. While the old gentleman denies that he knew ' his son was insolvent at the time, we are inclined- to think that he attributes a different meaning to the term “insolvency” than what courts understand by it; at least he knew that his son was heavily indebted; that he was unable to provide for his debts as they became due; that he was being sued from time to time, and was unable to pay even small ■ claims of a hundred dollars or such a matter, and that he, himself, had very large claims against him; that the property — all told — that his son was possessed of would not seem to be at all sufficient to discharge the indebtedness that the old gentleman had knowledge of, and therefore, whatever the intention of the parties were in making this instrument, we find this as a fact: That the mortgage was made by the son in contemplation. of insolvency; that he was insolvent at the time, and that the father knew that fact. _ The father denies that this was made to hinder, . delay, or defraud creditors. We have no hesitation at all in saying that we think the old gentleman had no illegal purpose to swindle anybody, that in all these transactions he did not intend that — that anybody ■ should be swindled in the transactions, but that he intended to do certain things which he thought were the best for himself and for his son, the purpose of which we^ are called upon, to say, as a matter of law, was to ' hinder or delay creditors. We think, therefore, that Rowland F. Russell intended no actual fraud or misconduct in the matter, but he took this mortgage under the circumstances we have indicated. We are constrained to think that he supposed that by giving this mortgage, the property could not be immediately seized and sacrificed on execution to these parties who were suing him. ITe was disposed to aid his son — had aided him largely in the past — that by fixing the property in that way, ' he might secure his son and still aid him, and. that he might be able to step in from time to time and endorse or become security for the claims '-.that were urgent against his son, and, as he expressed it in one part of *839 his testimony, “tide him over” and enable his son finally, with his help, to pay out. We think that was the position.
It was claimed that this mortgage itself, while it speaks of $2,500 ■ as due Rowland F. Russell — it is claimed, and it is undoubtedly the fact, that it is the same sum exactly that is referred to in the verification of the mortgage as being owed to R. F. Russell as trustee for Russell & Thayer, of which firm he was a partner. It is strongly urged in the argument that that of itself makes this instrument a conveyance in trust for the benefit of all the creditors other than the mortgagee, and that therefore the results under sec. 6343 must come to these parties.
It is claimed on the other hand, that in securing the claims of Russell & Thayer he was in fact but securing his own claim, and that when he assumed to take the mortgage and secure that claim it was not a taking- of a mortgage in trust for another creditor, but that he himself was the creditor, and the fact that Thayer was interested with him as a partner-would not make the security upon the claims in favor of other creditors as is spoken of in the decision, of the Supreme Court.
Upon the whole, after carefully considering that matter, we find no authority upon it anywhere — but, viewing it in the best light that we have, we think that this did not make the mortgage in trust to secure other creditors that the mortgagee in that regard so far as that partnership claim was concerned.
But there is still another feature of the mortgage. It will be observed, this having been taken in contemplation of insolvency — it provides in the mortgage itself that it shall secure future endorsements— future advancements, without naming the parties for whose benefit it shall be, except that it shall be for the benefit of the mortgagor, William S. Russell, and, in the affidavits attached to the mortgage — one of them at least, “future stays of execution and future endorsements of paper” -are named, and the question' is whether, in view of these provisions of the mortgage, it is an instrument in trust for the benefit of other parties than the mortgagee.
It was formerly doubted whether a person, being liable as security for another person, could take a mortgage to indemnify him, but, as the law is now, in Ohio, there is no question but that he may. But, in Bloom v. Noggle, 4 O. S., 45, in the opinion on page 57, the court say: “It is very true that it has been fully settled by repeated decisions of this court, that a creditor of an insolvent debtor, or one having assumed liabilities for him .as surety, may lawfully take from him a mortgage to secure such ■debt, or save harmless from such liability; and, as the reward of his diligence, will be protected in the priority thus obtained (citing authorities.)
“But it is equally well settled, that if he attempts to extend the lien beyond the necessity of his own indemnity, and secure the debt of any •other creditor, the mortgage is in substance and in legal effect an assignment within this provision of that act; and the mortgagee being a trustee for such other creditor, under the act becomes a trustee for all the •credits pf the mortgagor. Our reasons for holding such a mortgage an assignment within the purview of the law, are stated in the case of Hardrader v. Leiby, 4 O. S., 602, decided at the present term.”
The third, fourth and fifth paragraphs of the syllabus in Harkrader v. Leiby, supra, is as follows:
“Third — To bring a case within the operation of the law, there must 'be a transfer or conveyance of property on some valuable interest belonging to the insolvent debtor, in view of his insolvency, to be held by the ■person taking it for the benefit of some one or more of the creditors of ■•the debtor other than himself.
"Fourth — An assignment by way of mortgage may affect such trans *840 fer; and in such case, the mortgagee becomes a trustee for such creditor or creditors, and liable to account to him, or them, for the interest so received.
“Fifth — Where such interest is received by any species of conveyance, binding the recipient, either expressly or by necessary implication,, to account in chancery to any creditor of the assignor, the statute enlarges the trust and makes it inure to the benefit of all his creditors,, and distributes the fund to all, in proportion to their respective demands.”
It is easily seen that if this may be done in. this form, the actions-referred to under sec. 6343, Rev. Stat, may be had without incurring the penalties provided for in that section — that is, if the debtor is-indebted to a large number of persons and he desires to prefer two or three to one, or any number of those creditors, instead of giving a mortgage directly to the creditor, he may give a mortgage to a third person, to indemnify that third person and for securing such of his debts as he saw fit to point out, and therefore a preference might be made- and certain creditors paid in full by the insolvent debtor and that without incurring the penalties of sec. 6343; and the question is whether, under the-circumstances of this case, there was such a provision as that in reality. The old gentleman says that he thought it was best to take this mortgage, and, of couse, thought best to take it with the porvisions stated in the mortgage securing, him against future endorsements for advances of/ money without specifying exactly where they were to be made. Fie says-he thought that by doing that he could tide his son over; that he could in. fact get him certain time as against some of the debts, and eventually -with) the purpose, as he stated, that he could step in from time to time where lie found the necessity to exist — where claims were strongly pressed — and/ become security himself for such claims as he or his son should see fit to designate and therefore provide for the payment in full, and be indemnified by this mortgage. We find that in fact that was carried out, to some-extent at least; that at the time there was a certain note oustand'ing that was contemplated to be renewed, the old gentleman afterwards renewed/ it, and I think he became bail for the stay of execution, for that, at least, however, that may be, the conduct of the parties afterwards seemed to be in conformity with that view of their intention, that is that certain-creditors should be secured and these results should be obtained that I have specified. In view of the provisions of the mortgage itself; in the light of the testimony of Rowland F. Russell and of the admissions 01-statements that he made in the affidavits attached to the mortgage, we-think that this was a mortgage given in trust by an insolvent debtor in-contemplation of insolvency and with intent to prefer 01m or more of his-creditors.
There is another feature of this matter that has given us some difficulty. Jennie B. Stocking had a mortgage of one thousand dollars prior to this mortgage in question, upon a portion of the same property. She-had not kept that renewal filed properly. She was made a party (0 this, action in- the court below and the finding was there against lier. During the pendency of this action, these creditors having reduced their claims, to judgment, caused levies to be made upon the property covered by the-Stocking mortgage, and they claim that, as the Stocking mortgage was void as to creditors, that they may thus levy upon the property covered' by it and that this mortgage being given expressly subject to the chattel' mortgage of Jennie Stocking, whatever rights should accrue to any person under this mortgage it would not involve the subjection of that interest which had theretofore belonged to Jennie Stocking to the amount of her mortgage. It is claimed that Jennie B. Stocking did not appeal' this case and that she is not before this court with her claim, that her *841 mortgage is out and we have nothing- to do with it except to determine what interest the levying creditors have in that part of the property.
With the view we take of the case, it is perhaps unnecessary to say whether we regard her as being before this court or not — as we consider the matter — when this mortgage was' given and accepted, it had its full ¿effect at once; it became an assignment in trust to prefer creditors and it inured to the benefit of all the creditors of William S. Russell.
It is claimed, I suppose, that under these circumstances, the mortgage not being set aside, is in force; but the trusts therein are simply enlarged, and the creditors who come in under it can have no more right under that mortgage than the mortgagee herself could have had, and he having notice of a prior mortgage, his creditors would be held to occupy the same position that he did. We think, however, that it does not make any difference in what particular form the creditors of the mortgagor seek to obtain their rights; that if the mortgage was void as to creditors, it makes no difference whether they sought to take the property under execution, or by proceedings such as this proceeding here. The cases of Bloomingdale v. Stein, 42 O. S., 168, and Blandy v. Benedict, 42 O. S, 295, I .think throws some light on this question. In the case of Bloomingdale v. Stein, supra, at page 168, the court, Okey, T., in announcing the opinion, says that, “Adolph, Wm. B. and Henry M. Landauer, partners as A. Landauer & Sons, dealers in ready made clothing at Columbus, Ohio, executed to Mark Bloomingdale, on December 5, 1878, a note for $3,000, due in one day, together with a warrant of attorney authorizing a judgment to be confessed thereon. On December 17, 1878, judgment was rendered in the court of common pleas of Franklin county, on the note and warrant in favor of Bloomingdale, for $3,005.80, and costs, on which judgment he caused an executions to issue on December 18, 1878, directed to the sheriff of Franklin county, which execution the sheriff, on the same day, at ten o’clock in the forenoon, levied on all the goods and chattels of the defendants subject to levy.
“S. Stein & Co., had a valid account against Landauer & Sons, amounting to $1,492.02, for goods sold in August, September, and October, 1878. On January 14, 1879, and while the property so levied on still remained in the hands of the sheriff, said S. Stein & Co. commenced an action, etc., and obtained judgment and caused execution to be put into the hands of the sheriff. The court found that the first transaction was fraudulent all through and that the proceedings under it amounted to ■an assignment under sec. 6344, Rev. Stat. The court, on page 172, say:
“If S. Stein & Co. had not commenced their action, Loeb and Frank ■Bros & Co., might have treated the Bloomingdale levy as a nullity and obtained satisfaction of their judgments by a sale of the property on their execution.”
Stein & Co. began their action under this section, it will be observed.
“But when S. Stein & Co. commenced their suit, and the court acquired jurisdiction of the subject-matter and the parties, it was no longer possible for Loeb and Frank Bros. & Co. to proceed legally with their execution. On the contrary, while the sheriff is not ordinarily to be regarded as agent of either party to an execution, (Cooley on Torts, 129) the acts ofthe Landauers and Bloomingdale, culminating in the seizure of the goods on December 18, 1878, at 10 o’clock A. M. on execution, operated, on the election of a creditor to prosecute such suit, as a transfer of the goods to defraud creditors, at that hour, within the section under consideration (citing authorities) and hence, the subsequent levies of Loeb and Frank Bros. & Co. became and were properly held to be mere nullities. The fact that Loeb and Frank Bros. & Co. were not originally parties to the suit is of no importance. They filed answers and cross-petitions.”
*842 And in Blandy v. Benedict, supra, a deed of assignment was made after the execution of certain mortgages upon the property assigned and' the_ deed of assignment upon its face excepted from the operation of the assignment all existing liens.
Paragraph four of the syllabus is as follows:
“4. A deed of assignment for the benefit of creditors, which excepts, from the operation of the assignment ‘AH existing liens,’ does not give priority to a mortgage lien which is void as against creditors although, valid as against the assignor.”
In disposing of this case the court, on page 298, say:
“The deed of assignment ‘excepts from the operation of the assignment all existing liens, which are not to be affected thereby, But by no fair-interpretation of this clause can it be said that the assignor intended to-except from the operation of the assignment his equity of redemption in the mortgaged property. The assigned estate was administered on the-theory that the equity of redemption passed to the assignee for the-benefit of creditors. What, then, was the purpose of this clause? We think there can be no doubt that the intention was to secure the mortgagees the full amount of their liens to the extent that such liens were-valid as against the assignor. Can such purpose be accomplished by such means? We think not. Undoubtedly these mortgages are valid, as against the assignor, but void as against his creditors. * * * The right of creditors to seize the property in the hands of the assignee did not exist, but the assignee was bound, in law, to administer the trust for their benefit. Every right which the creditors might have asserted against the property before the assignment, the assignee is bound to-secure for their benefit after the assignment. Liens invalid as against creditors at the time of assignment remain invalid. These mortgages were void as against creditors at the time of the assignment, unless they were made valid by the clause of the deed of assignment now under consideration. The validity or invalidity of an alleged lien is a question of law. It does not depend on the will of the grantor in an- alleged mortgage. This clause neither validated nor invalidated the mortgages in, any respect; nor did it except or assume to except from the operation of the assignment the mortgaged property.
“The property was assigned subject to the liens upon it, and it is-the law, not the dictation or convention of the parties, which determines the validity of the liens, and against whom they exist.”
When these levies were made, this action- was pending. The assigned property had been- taken possession of under this mortgage by Rowland F. Russell, who was held to be a trustee for the benefit of the creditors and his relations to the property were then- defined by the law, and we-think, under- the authority of these cases and of the reason of the matter, that these creditors could not, pending that action take from the assignee who, in- law, was holding the property for the benefit of all the creditors, that the sheriff could- not at their instance take possession of this property so as to make a valid levy and lien upon it under those executions.
In this case, it was said in the beginning, that in case the court should find that this assignment operated for the benefit of the creditors-that the question of the rents and the statement of the account and all' that, was to be referred to some person to take an account; that was not submitted to the court and the court has done nothing in regard to it. So the order will be made referring that part of case to some master or referee.
There is another question in this case which is even more difficult still than any we have passed upon; that is to say: Under the circumstances of the case, and under the law as we have held it, the question isr *843 what is the true construction of secs. 6343 and 6344, Rev. Stat., regarding, the preference of the plaintiff to the cross petitioners and the coming in and answering, on the fifteen days’ notice. Was this interpolation— “And the probate judge of the proper county after any such transfer, conveyanceofassignment shall have been declared by a court of competent jurisdiction, to have been made with the intent aforesaid, or in trust with-the intent mentioned in the next preceding section,” and the question is whether or not the interpolation of that line into sec. 6344 had the effect of modifying any of the provisions of this sec. 6343 which provided, for the appointment of a trustee and inure to the benefit of all the creditors, or whether the plaintiff and cross petitioners only got the preference provided in case of their coming in, under sec. 6344 Rev. Stat., where the transfer was not made to one, but to all the creditors, and. where it was, to be declared void and set aside.
We are in some doubt still over the proper construction of that statute in that regard, and although we have arrived at a provisional-judgment in the matter we have concluded that, unless counsel see something that makes it necessary to determine that matter now, we are inclined to think that it would be better to allow that to be in abeyance until-we come from Sandusky, when we hope that the report of the master will be before the court and that that matter and this can be disposed of' at the same time.
Mr. Doyle: “The present order will be simply that the court finds that the mortgage is an instrument of assignment in trust under sec. 6343.”
The Court: “Yes.”
Mr. Doyle: “Referring the whole thing to the master for a determination of the rents, the claims of the bank, etc., without a solution of that question now?”
The Court: “The amounts and validity of these claims against
William S. Russell, as represented here, I think are not disputed?”
Mr. Doyle: “No, there is no issue made as to the correctness of the-claims. If there is to be anything which is to take the shape of a final-decree, or any question of that kind, we want such a finding of facts as to-enable us to have the question reviewed.”
Haynes, J.: “We shall hold this term open until the twentieth of December, when we shall come back here again.”
Mr. Doyle: “If the court is to determine now that this instrument simply inures to the benefit of the creditors under sec. 6343, the question as to whether we participate in the result — that is, whether Rowland? F. Russell will participate in the fund as a creditor ,we can leave that to be determined upon the coming in of the report.”
The Court: “It was in my mind that the reference would be to find the amount of these rents and profits and such credits as would be placed' against them for necessary improvements, etc., and that this matter would b.e determined by the court, bfit I don’t know as there would be any- objection to referring that question.
Mr. Doyle: “The question might be referred to a master to find: out what credits there are and determine all the debts of W. S. Russell, an'd then determine this question upon, the coming in of the court.”
Mr. Fuller: “Does the court find the conveyance to be constructively fraudulent?”
The Court: “We simply find 'that it was made under section 6343.. We have stated in our conclusions, however, the effect of certain testimony which Rowland F. Russell gave as to his purposes, that we treated* it as bearing upon that issue, as determining the real character of that conveyance, as to whether it was in trust or not. We will have to pass-this for the present, until 2 o’clock, and we will dispose of it then.”
*844 Mr. Doyle: “I would like to have some disposition made of the Churchill case. I want a finding of facts as a basis for the decision already rendered, and I, of course, want that finding of facts to be made by the court before the entering of any decree. I understand that the journal is to be kept open until the twentieth of December?”
The Court: “Yes.”
■ Mr. Doyle:"Then I ask the court to give me a reasonable time to prepare a finding of facts — as it will be for us to prepare it and when that is done, I have suggested to counsel that, insofar as we can- agree upon matter that would be properly referred and if it should be determined that we cannot agree, then we will put into the entry when it is filed an order of reference. I either want that course taken, or else simply an order of reference alone. If there is to be a journal entry filed now without determining that this mortgage is a trust, then of course I want a finding of facts accompanying it. If the order is simply to refer the case to a master to report the questions of the value of the use and occupation of the property, without any further order being made now, of course it will not be necessary until the report comes in. There are one or two things which will necessarily go to the master not passed on by the court; as, for instance, the allegations in our answer that, out of the funds that came into the hands of Mr. Russell, certain payments have been made to these petitioners and more than their proportion of the administration of the property, if it is administered as a trust. These matters all ought to be referred as well as to the account — as to who the creditors are. I am indifferent, myself, whether the court will simply make an order of reference to bring into court the information which is the necessary basis of a final decree; or, if the counsel want the judgment of the court so far as it has been announced by the court, I must have my finding of facts before that judgment is entered.”
Mr. Fuller: "We are willing that the court should have a reasonable length of time.”
Mr. Pratt: “I would suggest — I don’t know whether your Honors will be here or not — or whether we could meet you — but I would suggest that we may agree upon a finding of facts and we may agree upon most of the matters to be referred. So far as the details of the case, I don’t know anything about it. I would suggest that if your Honors can name a time when- we can meet you and settle any dispute which may arise between us, the matter might be left just as it is.”
Mr. Doyle: “My own judgment about the rational way to do it would be now to simply make an order of reference, and, upon the coming' in of the report, make a final judgment and decree.”
Mr. Pratt: "If there is some place where we can meet, no matter how informally it might be — •”
The Court: "We shall be here a week from Monday, but we will have a case to hear which will occupy our attention. But the week following, we will be here — two weeks from Monday — the first Monday, we have got to decide a case. We are anxious to arrange this so as to get this whole matter disposed of at this term of the court.”
Mr. Pratt: “Yes, and we will find out between this and that, what is necessary. It may be that we can substantially agree.”
The Court: "Why can’t you agree on your reference if it stands under sec. 6344, Rev. Stat. ?”
Mr. Doyle: “We have the opinion of tha court and can determine that question-; but, what I was suggesting was, that if through any accident it happened that we had a partial decree of the court at this trial and it went over, it would be impossible to determine what our rights were, with a view to having a review of the case. We will agree upon *845 all we can, whether it is referred or not; why not make the order of reference and have the court enter a final judgment upon the coming in of the report?”
Mr. Pratt: “Exactly what is to be referred, would be a question about which we might differ. That we can settle when the court comes here.”
Mr. Doyle: “I don’t like to have two entries in the case at different terms.”
The Court: “We can make a general order that the case is referred as to certain matters, and you can agree on the journal entry.”
Mr. Pratt: “The court might say: ‘Referred as to certain matters; see entry.’ ”
Mr. Doyle: “Then there will be no entry made now which will require me to file a motion for a new trial now?”
The Court: “We will simply say: ‘Cause referred as to certain matters to blank.’ ”